IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: _____

TCR SPORTS BROADCASTING HOLDING, LLP
d/b/a MID-ATLANTIC SPORTS NETWORK

      Plaintiff,

v.

CABLE AUDIT ASSOCIATES, INC.
d/b/a MEDIA AUDITS INTERNATIONAL

      Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, TCR Sports Broadcasting Holding, LLP d/b/a Mid-Atlantic Sports Network

("MASN") by and through its undersigned counsel and for its Complaint against Cable Audit

Associates, Inc. d/b/a Media Audits International ("MAI") alleges as follows:

### I.    <u>NATURE OF ACTION</u>

1.    MASN, a regional sports network, brings suit for breaches of contracts against

MAI withwhichMASN contracted for the audit and verification of cable distributors' subscriber

counts to ensure appropriate payment to MASN for the distribution of its programming.

2.    MASN is entitled to damages against MAI for those breaches.

### II.    <u>PARTIES</u>

3.    MASN is a Maryland limited liability partnership with its principle place of

business located in Baltimore, Maryland.

4.      MAI is a New York corporation with its principle place of business in Greenwood

Village, Colorado.

### III.     JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because

there is complete diversity of citizenship, and the amount in controversy exceeds $75,000

exclusive of interest and costs.

6.      Personal jurisdiction over MAI comports with due process under the United

States Constitution as MAI is registered to do business in Colorado and maintains its principle

place of business in Colorado.

7.      Venue is proper pursuant to 28 U.S.C. §1391(b)(1).

### IV.     FACTUAL ALLEGATIONS

8.      MASN is a regional sports network that produces and licenses for broadcast over

300 Baltimore Orioles and Washington Nationals Major League Baseball games and other sports

programming and sports-related informational content for distribution by various cable and

satellite operators, known as multi-channel video programming distributors ("MVPDs" or

"MSOs" (multiple-system operators)) throughout a defined territory in the Mid-Atlantic region.

9.      MASN's territory in which its programming is broadcast extends from central

Pennsylvania, to all of Maryland, Virginia, Delaware, the District of Columbia, the eastern

portion of West Virginia and into eastern and central North Carolina.

10.     MASN has entered into contracts, known as affiliate agreements, with various

MVPDs for the distribution of MASNprogramming.  MASNprogramming is to be distributed on

only the first or second most highly penetrated level of video service of the MVPD or on any

other level of video service that is received by at least seventy-five percent (75%) of the total number of each MVPD's system television subscribers.

11.    The contracts with MVPDs also obligate an MPVD to carry a second channel that broadcasts either the Nationals' or Orioles' games when the teams play simultaneously such that they overlap in whole or in part (identified herein as the "Overflow Channel" or "MASN2").The Overflow Channel must also be carried on only the first or second most highly penetrated level of video service of the MVPD or on any other level of video service that is received by at least seventy-five percent (75%) of the total number of each MVPD's system television subscribers.

12.    With the beginning of the 2007 Major League Baseball season in April, MASN launched the Overflow Channel for Orioles' and Nationals' games, and programming ancillary to those games.

13.    All programming of the Mid-Atlantic Sports Network is defined as the "Service" in the affiliate agreements with the MVPDs, which includes programming carried on the main channel ("Channel 1") and programming carried on the Overflow Channel.

14.    Each MVPD has the right to designate the channel number for both channels within each MVPD system, however, throughout each Major League Baseball season,the designated channel must remain the same.

15.    Pursuant to the affiliate agreements with the MVPDs, each MVPD pays a monthly fee to MASN for each subscriber of the MVPD that receives the Service (Channel 1 and the Overflow Channel) based on rates identified in thatagreement.  The subscriber rate paid by an MVPD to MASN depends upon the geographical region in which the MVPD system is located.

16.     In addition to each monthly subscriber fees payment made by a MVPD to MASN, a MVPD reportsthe Service subscriber counts by system (designating the geographical region for each such system).

17.      In order to ensure, among other things, that the monthly subscriber counts provided by aMVPD are accurate or within industry standard variances, among other things, MASN has annual audit rights in accordance with industry standards as contracted for under the affiliate agreements with the MVPDs.

18.     MAI is an entity that "engage[s] in the business of auditing and verifying subscriber counts supplied by [MVPDs] to program suppliers" such as MASN.

19.     MASN entered into certain contracts with MAI to provide to MASN "auditing" and other services to verify subscriber counts provided by MVPDs, which subscriber counts are used to verify the monthly subscriber fees paid by a MVPD to MASN.

20.     On February 27, 2007, MASN entered into the first of a series of contracts with MAI. MASN and MAI entered into contracts for services dated July 22, 2008; April 20, 2009; April 21, 2010; August 19, 2011; and October 22, 2012 (collectively referred to as the "Audit Agreements").  Each annual contract with MAI was for a specified audit period for each MVPD with which MASN has an affiliate agreement.

21.     As part of its broader scope of work, MAI agreed to verify the number of subscribers receiving the MASN Service for each MVPD system to ensure that the subscriber fees paid to MASN for the distribution of the Service were accurate.  The parties also contracted for MAI to provide MASN the "level of carriage and channel number for the MASN service," among other information.

22.     MASN provided to MAI copies of its affiliate agreement with each MVPDas well as the payments and subscriber counts received from each MVPD.

23.     Aspart of its verification process, MAI collected "materially relevant information" directly from the MVPDs, including electronic billing records; operating files; and channel line-up (a MVPD's line-up of where each programming channel is found), among other documentation.  On information and belief, MAI employees, agents or servants collected certain information during visits to a MVPDs' regional locations, while other information was provided electronically by each MVPD to MAI.

24.     Pursuant to the Audit Agreements, MAI conducted audits of the payments received by MASN from the MVPDs.For each MVPD, MAI produced a report for adefined audit period that identified subscriber variances, *i.e.,*whether the MVPD over- or under-paid MASN for the Service.

25.     MASN relied upon those reports and the subscriber variances contained therein, among other information in the report, tonegotiate with an MVPD to resolve discrepancies in the subscriber counts and other issues related to payment for the Service. MAI was aware that MASN relied upon the audited subscriber counts to resolve carriage and payment issues with the MVPDs.

26.     In late 2011, MAI began a "re-audit" of the MVPDs' subscriber counts related to the carriage of the Overflow Channel (the "Shortfall Variance").  On or about May 11, 2012, MAI provided its report to MASN (the "Re-audit Report").  At no time prior to the issuance of the Re-audit Report did MAI identify or report to MASN that certain MVPDs had not paid MASN for the distribution of the Overflow Channel on a different tier than Channel 1.  Thus,

those subscriberswere receiving the Overflow Channel but MASN was not paid by the MPVD

for the distribution of the Overflow Channel to those subscribers.

27.     MAI conducted the re-audit and identified the Shortfall Variance only after

MASN had identified to MAI the issue of the non-payment for thecarriage of the Overflow

Channel on a different tier than Channel 1.

28.     The Re-audit Report identified four MVPDs that had underpaid MASN for the

carriage of the Overflow Channel on a different tier than Channel 1: Comcast Corporation

("Comcast"); Cox Communications, Inc. ("Cox"); Verizon Services Corp. ("Verizon"); and

Charter Communications Holding Company, LLC ("Charter").

29.     Charter filed for bankruptcy protection in the Southern District of New York on

March 27, 2009.  As MASN was unaware of Charter's shortfall variance related to the Overflow

Channel, MASN did not file a proof of claim for that underpayment.

30.     In its Re-audit Report, MAI determined that for the period of time beginning May

2006 through April 2011, Comcast underpaid MASN $19,147,110.00 for Comcast's distribution

of the Overflow Channel on a different tier than Channel 1 on certain geographical systems.  For

the period of time October 2006 through December 2010, MAI determined that Cox had

underpaid MASN $1,934,168.00 for Cox's distribution of the Overflow Channel on a different

tier than Channel 1 on certain geographical systems.  For the same period of time, October 2006

through December 2010, MAI determined that Verizon had underpaid MASN $239,855.00 for

Verizon's distribution of the Overflow Channel on a different tier than Channel 1 on certain

geographical systems.  For Charter, MAI determined that for the period of time beginning

December 2006 through November 2007, Charter underpaid MASN $44,803.00 for Charter's

distribution of the Overflow Channel on a different tier than Channel 1 on certain geographical systems.

31.     To conduct the re-audit and determine the Shortfall Variance, MAI used the same information provided by MASN and the MVPDs, including the channel line-ups and billing reports that it had available to it to conduct the original audits for each MVPD.

32.     MASN has not been paid by the MVPDs for the Shortfall Variance related to the Overflow Channel.

33.     All conditions precedent to bringing this action have occurred or been performed.

## V.     CLAIMS FOR RELIEF

### COUNT I
Breach of Contract

34.     MASN repeats and re-alleges all of the allegations contained in the foregoing paragraphs of this Complaint as if restated in full.

35.     The Audit Agreements are valid, binding and enforceable contract between MASN and MAI.

36.     MASN has substantially performed all of its obligations under the Audit Agreements, including payment to MAI.

37.     MAI contracted with MASN to provide auditing and verification services, among others.  As described more fully hereinabove, MAI breached its contractual obligations to provide those auditing and verification services, among others.

38.     MAI's breaches of the Audit Agreements resulted in actual and consequential damages to MASN in excess of Twenty Million Dollars, the exact amount to be determined at trial.

## VI.   **REQUEST FOR RELIEF**

WHEREFORE, MASN respectfully requests this Honorable Court enter judgment in its favor and against MAI as follows:

(a)     For all damages, including all applicable actual, consequential and/or incidental damages arising from or relating to MAI's breaches of the Audit Agreements, in an amount to be proven at trial;

(b)     For recoverable interest;

(c)     For costs and expenses incurred by MASN, including attorneys' fees and costs, and any expert witness fees incurred in litigation; and

(d)     For such other relief as the Court deems just and proper.

MASN hereby demands a jury trial.

Dated:   July 9, 2013

/s/ Mark E. Haynes
Mark E. Haynes
IRELAND STAPLETON PRYOR & PASCOE, PC
717 17th Street, Suite 2800
Denver, Colorado 80202
Telephone:(303) 623-3700
Facsimile: (303) 623-2062
E-mail: mhaynes@irelandstapleton.com

ATTORNEYS FOR PLAINTIFF
TCR SPORTS BROADCASTING HOLDING, L.L.P.
d/b/a MID-ATLANTIC SPORTS NETWORK